IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| ERVIN J. KUHL, | ) |
| Plaintiff, | ) CASE NO.: 1:15-cv-00053-JAJ-CFB |
| v. | ) |
| CAROLYN W. COLVIN, Commissioner of Social Security, | ) **REPORT AND RECOMMENDATION AND ORDER** |
| Defendant. | ) |

Plaintiff Ervin J. Kuhl moves for reversal of Defendant Social Security Commissioner's decision denying his claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. The Commissioner moves that the Court affirm the denial. This Court reviews the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## I.  PROCEDURAL BACKGROUND

Kuhl filed a Title II application for DIB on July 27, 2012, alleging a disability onset date of February 6, 2012 [AR[1] 188–190]. The Commissioner initially denied his claim on October 1, 2012 [AR 114–122], and again upon reconsideration on December 21, 2012 [AR 124–132]. Kuhl timely requested a hearing and received one before Administrative Law Judge (ALJ), Jan E. Dutton, on April 2, 2014 [AR 133, 40–95]. On May 30, 2014, the ALJ opined that Kuhl was "not disabled under section 216(i) and 223(d) of the Social Security Act" [AR 30] anytime between February 6, 2012 and May 30, 2014, and denied Kuhl benefits. The Commissioner's decision

---

[1] All citations to "AR" refer to the appropriate page of the administrative record.

1

became final when the Appeals Council denied Kuhl's request for review of the ALJ's decision on August 20, 2015 [AR 1–4]. Kuhl now appeals the denial of benefits to the district court [ECF 9]. On January 7, 2016, this case was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) [ECF 6]. The transcripts and briefs were filed by May 25, 2016 [AR 12]. This matter is fully briefed and ripe for decision [ECF 9–12].

## II.  FACTUAL BACKGROUND

Born in 1955 [AR 188], Kuhl was 57 years old at the time of his alleged disability onset date [AR 41]. Kuhl is high-school educated [AR 53]. Prior to the 2012 onset date, Kuhl had "a long and steady work history with excellent earnings" [AR 26]. Kuhl worked as a truck driver for over twenty years [AR 192–195], and before that, as a meat packer for approximately twelve years [AR 64]. Kuhl's earnings reached $70,507.38 [AR 193]. Kuhl has not worked since his alleged disability onset date and his only income has come from private disability insurance, which ended March 2013 [AR 44–45].

Kuhl was divorced in 1986 and raised his three children as a single father [AR 54]. He now lives alone and takes care of his house [AR 55]; does his own cooking, cleaning, and laundry [AR 62]; and drives his car to the casino and to visit friends [AR 63].

## III.  MEDICAL HISTORY

Kuhl reported that his tremors are what ended his work; other medical conditions he alleges limit his ability to work include: hypertension, liver condition and diabetes, and cognitive abilities.

### A. Tremors

Kuhl reported that he stopped work because of his hand tremors [AR 56, 309, 352]. Kuhl's work ended in February of 2012, when Kuhl's boss observed a tremor in his arm and sent him to the company doctor [AR 56]. The company doctor refused to pass him for the Department of Transportation (DOT) physical.

Kuhl indicated that he first noticed a tremor in his right arm on January 7, 2012, while driving [AR 352]. However, prior to his February 2012 onset date, Kuhl was seen by his primary care provider at Mercy Hospital, Robert M. Kent, M.D., on January 9, 2012; Dr. Kent noted that Kuhl was doing well and had no complaints [AR 315]. No tremors were noted.

On March 12, 2012, during a follow-up appointment with Dr. Kent to review Kuhl's lab work, Gail Young, PA-C, observed Kuhl's tremors, and noted that there was a "[s]trong odor of alcohol" on Kuhl and that Kuhl reported a "fairly high alcohol intake on a daily basis, [sic] he reports having 2-3 shots per night" [AR 312]. She also noted that he reported having the tremors for several years. Based on these observations, Dr. Kent referred Kuhl to a neurologist for further testing [AR 352].

Kuhl was evaluated by Robert Sundell, M.D., a neurologist, on April 25, 2012, for his tremors per Dr. Kent's referral [AR 352]. Dr. Sundell noted that only Kuhl's right arm was shaking during the appointment, but that the patient reported that both arms shake or his whole body shakes on "bad days." Dr. Sundell referred Kuhl for an MRI and suggested laboratory testing be done.

On Kuhl's April 30, 2012, follow-up appointment, Dr. Kent noted that no tremor was observed during Kuhl's March DOT physical, but that he had been unable to return to work due to the tremor [AR 309].

On May 9, 2012, Kuhl was given an MRI, as ordered by Dr. Sundell. Jason T. Helvey, M.D., reviewed the results and determined that Kuhl's brain volume loss was mildly prominent for his age [AR 351].

In a follow-up appointment with Dr. Sundell on June 5, 2012, Dr. Sundell found that Kuhl's tremors were "much better now" and that his "sister agrees" [AR 350]. Dr. Sundell saw "a hint of a postura tremor," but noted that Kuhl had not had any "more of the marked tremor issues" of which he previously complained. Dr. Sundell concluded that he had "mild essential tremor" that may be exacerbated by illness or stress.

Dr. Kent saw Kuhl during an October 2, 2012, follow-up, Dr. Kent noted that Dr. Sundell had not started Kuhl on any treatment for the "mild essential tremor" and Dr. Kent prescribed 50 mg of Mysoline as needed for Kuhl's tremors [AR 391, 485]. His tremors improved with medication; by the time of the hearing with the ALJ in 2014, he reported that he only needed to take it twice a month [AR 27, 70–71, 302, 459]. During a December 27, 2012, appointment, Dr. Kent noted Kuhl's tremor "improved significantly" and his follow-up labs were improving [AR 458–459]. On March 30, 2013, Dr. Kent wrote to Allsup, Inc., Kuhl's Social Security consultant [AR 36], regarding Kuhl's disability status and opined that the tremor had "improved slightly" [AR 470]. However, on June 26, 2013, Dr. Kent wrote Cigna Group Insurance regarding Kuhl's disability status and opined that Kuhl's "cognitive function is such and that his tremors are such that I do not think he can go back to his existing job" [AR 483].

During his ALJ hearing on April 2, 2014, Kuhl claimed he was having a tremor; the ALJ noted that he did not see any shaking [AR 59].

**B. Hypertension**

Kuhl has a history of hypertension and has been prescribed atenolol for his condition [AR 311, 409]. On February 27, 2012, Dr. Kent referred Kuhl to Joseph Jarzobski, M.D., for a Bruce Protocol[2] Treadmill Stress Test; Kuhl received a work level max METs[3] of 5.4 [AR 333]. The test came back negative for coronary artery disease [AR 334]. On March 12, 2012, Gail Young, PA-C, reviewed Kuhl's lab results with him. She observed that the test results were "less than optimal" because he exercised for less than one minute and "was somewhat uncooperative during exam" [AR 312]. She also noted that he "denies any chest pain and has no respiratory symptoms." He was diagnosed with stable hypertension.

When Kuhl was seen by Dr. Kent during his appointment on March 26, 2012, Dr. Kent noted an elevated blood pressure and increased his dosage of atenolol from 50 mg to 100 mg daily [AR 311]. Dr. Kent prescribed 160 mg of fenofibrate daily for Kuhl's cholesterol [AR 485].

Kuhl was again seen on October 22, 2012, by Dr. Kent, with complaints of shortness of breath and weakness [AR 389]. On October 25, 2012, Kuhl was hospitalized at Mercy Hospital

---

[2] A Bruce Protocol stress test has seven stages; stage one starts at 5 METs or 1.7 mph and a 10% grade. Stage two starts at 7 METs or 2.5 mph at a 12% grade. Stage three starts at 9 METs or 3.4 mph at a 14% grade. Stage four starts at 13 METs or 4.2 mph at a 16% grade. Stage five starts at 15 METs or 5 mph at an 18% grade. Stage six starts at 18 METs or 5.5 mph at a 20% grade. Stage seven starts at 20 METs or 6 mph at a 22% grade. *See* Jonathan Hill and Adam Timmis, *Exercise Tolerance Testing*, 324(7345) BMJ: BRITISH MEDICAL JOURNAL 1084 (2002).

[3] Metabolic equivalents of task (MET) measure exercise capacity. Harvard School of Public Health, *Measuring Physical Activity*, https://www.hsph.harvard.edu/nutritionsource/mets-activity-table/ (last visited Oct. 17, 2016). A MET unit is the energy cost of physical activity and 1 MET reflects the energy cost of an average adult of approximately 160 lbs, sitting quietly. 1 MET = 3.5 mL $O_2$/$kg^{-1}$/$min^{-1}$ of body weight. Light exercise is anywhere between 1-3 METs. Moderate exercise is anywhere between 3-6 METs. Vigorous exercise is above 6 METs.

in Council Bluffs, Iowa for a cardiac work-up [AR 409–410]. His chief complaints were chronic dyspnea on exertion. Dennis Tierney, M.D., a cardiologist at Mercy Hospital, noted that Kuhl's creatine phosphokinase (CPK) level was highly elevated, and diagnosed him with "peripheral musculoskeletal breakdown" resulting from taking simivastatin rather than from a cardiac condition [AR 410]. Dr. Teirney noted that his echocardiogram was normal [AR 409]. Kuhl reported no history of cardiac disease and denied chest pain, lightheadedness, and synocope.

During a December 27, 2012, follow-up, Dr. Kent noted Kuhl's hypertension was well-controlled with medication [AR 459]. However, on January 17, 2013, in a Physical Capacities Evaluation for Social Security, Dr. Kent indicated that Kuhl could only engage in a total of five hours of standing in an eight hour day, would be unable to use his left hand for pulling and pushing, would be unable to use either hand for fine manipulation, and opined that Kuhl could lift up to ten pounds frequently, twenty pounds occasionally, and could never lift over twenty pounds [AR 464–465]. In a June 26, 2013, letter to Cigna Group Insurance, Dr. Kent opined that Kuhl was unable to return to his past work [AR 483].

### C. Liver Condition and Diabetes

On March 12, 2012, Dr. Kent and Gail Young, PA-C, noted that Kuhl had elevated liver test results [AR 312]. On July 11, 2012, Kuhl was evaluated by Jason Cisler, M.D., at Mercy Hospital on referral for an initial consultation regarding the abnormal liver chemistry tests [AR 355]. Dr. Cisler noted that Kuhl drank alcohol, was on statins, and that he was at high risk of non-alcoholic fatty liver disease [AR 356]. Dr. Cisler ordered a multiplanar multisequence MR imaging test to evaluate Kuhl's elevated liver enzymes on July 30, 2012; the test indicated fatty infiltration of the liver [AR 321, 404].

During Kuhl's October 25, 2012, hospital stay, gastroenterologist specialist John Canella, III, M.D., observed elevated liver function and alcohol use [AR 413]. Kuhl's discharge diagnoses included alcoholic hepatitis; elevated CPK with myalgia secondary to side effects of statin as well as alcohol; subclinical hypothyroidism; macrocytic anemia secondary to alcohol and subclinical hypothyroidism; borderline diabetes; hyperlipidemia; alcohol abuse without dependency; fatty liver; iron overload secondary to toxic effects of alcohol versus hemochromatosis [AR 415].

Yong H. Pratt, D.O., diagnosed Kuhl with diabetes on October 23, 2012 [AR 423] during his hospital stay. He was prescribed 1000 mg daily of metformin for diabetes, 20 mg of prednisone as needed for his gout [AR 285]; and 50 mg of trazodone as needed for sleep [AR 485].

### D.  Cognitive Abilities

On June 26, 2013, Dr. Kent reviewed Kuhl's disability paperwork for Cigna Group Insurance and noted that his tremors combined with "his cognitive function is such . . . that I do not think he can go back to his existing job" [AR 483]. Dr. Kent referred Kuhl to Dr. Sundell, a neurologist for further testing [AR 491].  During his October 9, 2013, appointment with Dr. Sundell, Dr. Sundell noted possible extrapyramidal symptoms and raised the possibility of neurodegenerative disorder [AR 492]. Dr. Sundell did not diagnose Kuhl with a cognitive impairment, but Dr. Sundell referred Kuhl for neuropsychological evaluation to assess Kuhl's memory complaints [AR 493].

Amelia Nelson Sheese, Ph.D., neuropsychologist at the Nebraska Medical Center, evaluated Kuhl on November 27, 2013, because Dr. Sundell raised the possibility of neurodegenerative disorder [AR 492], and Kuhl's record indicated he had complained of short-

term memory problems [AR 484]. Kuhl's behavior during the evaluation was reported as uncooperative and the results reported as possibly "underestimate[ing] his true cognitive abilities" [AR 486]. "Across measures of simple attention, working memory, and visuomotor and oral processing speed, Mr. Kuhl's performance ranged from low average to average" [AR 486]. "Overall, Mr. Kuhl showed no consistent impairments within cognitive domains, and all of his cognitive results fell within the broadly normal range" [AR 487]. Dr. Sheese made recommendations to Kuhl for improving his memory, such as repeating information into his own words, but Dr. Sheese made no diagnosis regarding Kuhl's cognitive impairment [AR 488].

Kuhl's May 9, 2012, MRI results showed a brain volume loss mildly prominent for his age and deep gray matter mineralization, associated with neurodegeneration [AR 351]. Dr. Sundell reviewed this MRI report and concluded it was overall negative, and that the results were normal for Kuhl's age [AR 350].

## IV.  ALJ DECISION

On May 30, 2014, the ALJ issued a decision denying Kuhl's claim for DIB under Title II of the SSA [AR 30]. The ALJ analyzed Kuhl's claim utilizing a five-step sequential evaluation procedure [AR 20–30].[4]

---

[4] 20 C.F.R. §§ 404.1520(a)(4)(i)-(v) provides that "(i) [a]t the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . . (ii) At the second step, we consider the medical severity of your impairment(s). If you do not having a severe medically determinable physical or mental impairment that meets the duration requirement of § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . . (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of [subpart P of part 404 of this chapter] and meets the duration requirement, we will find that you are disabled. . . . (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . . (v) At the fifth

At Step One, the ALJ determined that Kuhl had not engaged in substantial gainful activity[5] since February 6, 2012, the alleged onset date [AR 20].

At Step Two, the ALJ determined that Kuhl suffered from the following severe impairments[6]: hypertension, tremors, diabetes mellitus, and obesity [AR 20]. The ALJ found that Kuhl's history with alcohol was immaterial, because Kuhl was diagnosed with alcohol abuse without dependency in October 2012, and testified that he did not abuse any substances during the alleged period of disability [AR 22]. The ALJ determined that Kuhl did not have a severe cognitive impairment. In making this determination, the ALJ noted that Dr. Kent's opinion (that Kuhl's cognitive ability paired with his tremors made him unable to go back to work at his existing job) did not reflect any examinations, diagnosis, or treatment for mental symptoms. In November 2013 Dr. Sheese, the neuropsychologist, concluded, after testing, that Kuhl fell within the normal range. The ALJ also gave considerable weight to opinions from Myrna Tashner, Ed.D. and David Christiansen, Ph.D., non-examining state agency psychological consultants, that "he does not have a medically mental determinable impairment" [AR 97–110], finding that their conclusions were consistent with the medical record as a whole. In finding that Kuhl suffered from the severe impairment of obesity, the ALJ also considered Kuhl's weight in the second through fifth steps, even though no medical source had attributed Kuhl's disability to his weight [AR 21].

---

and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled."
[5] 20 CFR 404.1572 defines "substantial gainful activity" as work involving significant physical or mental abilities usually for pay or profit.
[6] 20 C.F.R. §404.1520(c) defines a "severe impairment" as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities."

At Step Three, the ALJ reviewed the medical record and determined that Kuhl's severe impairments or combination of impairments did not meet or medically equal one of the listed impairments in 20 CFR part 404, Subpart P, Appendix 1 [AR 23].

The ALJ determined that Kuhl had a residual functional capacity (RFC) to perform less than a full range of medium work as defined in 20 C.F.R. §§ 404.1567(c), although he could not constantly handle, finger or feel. The ALJ considered both objective evidence and subjective complaints regarding Kuhl's nonexertional and exertional limitations [AR 26]. The ALJ considered Kuhl's memory test-results and complaints, and the fact Kuhl's memory was improving. The ALJ considered Kuhl's testimony that the tremors affected his whole body; his hands cramped when holding a newspaper; his prescription medication had improved his tremors; he only needed to take the medicine a couple times a month; he would rather not do other work; and he had not tried to pass the DOT physical after his tremors had improved because he was waiting to see what happened with his disability benefit award [AR 24]. The ALJ noted that Kuhl's work history was excellent, which bolstered his credibility [AR 26]; however, the ALJ found that the medical record did not support the severity, frequency, or residual effects claimed [AR 25]. The ALJ considered that Kuhl had diabetes and was obese, and that obesity can exacerbate existing limitations [AR 20]. However, Kuhl's medical treatments were fairly routine in nature and his treatments consisted of prescription medications, some of which Kuhl reported only needing a couple times a month [AR 26].

The ALJ gave treating-physician Dr. Kent's medical opinions limited weight because his opinions were not reflected in the medical record, supported by objective testing, or supported by Dr. Kent's conservative treatments [AR 27–28]. The ALJ gave the opinions of non-examining state agency medical consultants Dennis Weis, M.D., and Matthew Byrnes, D.O., moderate

weight [AR 28]. The ALJ gave non-examining state agency medical consultant, Jose Rabelo, M.D., limited weight, because the record did not reflect that Kuhl's liver function testing remained elevated for three consecutive months, which is required in order to meet the Listing requirements [AR 28]. The ALJ gave Mr. McKeeman's vocational evaluation more weight than that of Michael Newman, M.D., L.P.C., L.M.H.P., because McKeeman's was better supported by the medical evidence [AR 28].The ALJ noted that Kuhl reported only minimal problems with personal care, ability to prepare simple meals, do housework, drive his car, shop, manage his finances [AR 221–225], and mow his lawn in fifteen minute increments.

At Step Four, the ALJ determined that Kuhl could perform past relevant work as a "truck driver, heavy" [AR 29]. The ALJ considered the Commissioner's Dictionary of Occupational Titles definition of "truck driver, heavy" [*Revised Dictionary of Occupational Titles* 905.663-014 (4th ed. 1991)] and the vocational expert's testimony that a hypothetical individual of Kuhl's age, education, past relevant work experience, and RFC could perform his past relevant work as "truck driver, heavy" [AR 81].

At Step Five, the ALJ determined that considering Kuhl's advanced age, high school education, ability to communicate in English, and RFC, Kuhl can perform a significant number of jobs that exist in the national economy such as a meat clerk (1,000,000 jobs in the national economy), deliverer of merchandise (10,000 jobs), chop cutter (1,370 jobs)[7] [AR 30, 83].

Based on these findings, the ALJ determined that Kuhl was not disabled as defined by the SSA from Febuary 6, 2012, through the date of the ALJ decision, May 30, 2014 [AR 25].

---

[7] In the ALJ Decision, the ALJ's determination of significant other jobs listed meat clerk, merchandise delivery and "chalk cutter" [AR 30]. However, in the hearing transcript the job was listed as "chop cutter," which is how it is listed in this opinion [AR 83].

## V.  STANDARD OF REVIEW

The Court upholds an ALJ's decision if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g). "Substantial evidence is 'less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Maresh v. Barnhart*, 438 F.3d 897, 898 (8th Cir. 2006)); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971) (reasoning that substantial evidence means "more than a mere scintilla"). The Court considers evidence that both supports and detracts from the ALJ's decision. *Moore v. Astrue*, 623 F.3d 599, 605 (8th Cir. 2010). If substantial evidence supports the ALJ's decision, the Court will not reverse merely because substantial evidence exists in the record that would support a contrary outcome or because the Court would have determined the case differently. *Davidson v. Astrue*, 578 F.3d 838, 841–42 (8th Cir. 2009) (citing *England v. Astrue,* 490 F.3d 1017, 1019 (8th Cir. 2007)).

The court also reviews the Commissioner's decision to determine if there was a procedural error, an erroneous legal standard, or an incorrect application of the law. *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted). Issues of law are reviewed *de novo* with deference accorded to the Commission's construction of the Social Security Act. *See Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992).

## VI.  DISCUSSION

Kuhl moves to reverse the ALJ's decision because: A) the ALJ failed to classify Kuhl's cognitive impairment as a medically determinable impairment; and B) the ALJ failed to account for all of Kuhl's limitations when assessing his RFC.

### A. The ALJ Appropriately Classified Kuhl's Alleged Cognitive Impairment

Kuhl argues that the ALJ was in error when finding that Kuhl's cognitive impairment was not medically determinable for purposes of 20 C.F.R. § 404.1508, and when the ALJ did not proceed to determine its severity [ECF 9 at 8].

A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, shown by medically acceptable clinical or laboratory diagnostic techniques. 20 C.F.R. § 404.1508. The mere mention of a condition in the medical records or a claimant's "statements alone are not enough to establish that there is a physical or mental impairment." 20 C.F.R. § 404.1528 (a).

Substantial evidence supports the ALJ's finding that Kuhl's cognitive complaints did not amount to a medically determinable impairment. Kuhl did not claim a cognitive impairment as a limitation on his original application for disability [AR 212]. Kuhl has not been diagnosed with a cognitive impairment. Moreover, Kuhl has not undergone any treatment for a cognitive impairment. While an examining specialist, Dr. Sheese, recommended ways Kuhl could work to improve his memory based on Kuhl's complaints, these recommendations do not amount to treatment. In November 2013, Dr. Sheese opined that Kuhl's MRI was overall negative and that the increased atrophy was within the normal range [AR 350]. Kuhl reported some short-term memory problems in October 2013, but his exam results showed he could recall three-out-of-three objects in three minutes [AR 492]. Dr. Sheese also determined that the exam results were within the normal range, after testing Kuhl because of memory complaints on November 27, 2013 [496].

Kuhl gives great weight to his treating physician, Dr. Kent's, opinion that his cognitive abilities, paired with his tremors, made him unable to return to his old job. However, on June 26,

2013, Dr. Kent observed that there needed to be more testing done, so that there would be "definitive proof" of Kuhl's poor cognitive abilities [AR 483]. The ALJ appropriately discounted Dr. Kent's opinion because it was unsupported by objective testing, diagnosis, or treatment. *See Julin v. Colvin*, 826 F.3d 1082, 1089 (8th Cir. 2016); *see also Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015); *see also Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007). The ALJ appropriately gave more weight to the other examining doctors, and to Myrna Tashner, Ed.D. and David Christiansen, Ph.D., non-examining state agency psychological consultants' conclusions that Kuhl did not have a cognitive impairment, because their opinions reflected the information contained in the medical record as a whole. *See* 20 C.F.R. § 416.927(e)(2)(i–ii). Therefore, the ALJ was not in error.

Even if the cognitive impairment was medically determinable, the burden is on the claimant to establish that an impairment or combination of impairments are severe. *Mittlestedt v. Apfel,* 204 F.3d 847, 852 (8th Cir. 2000). "Severity is not an onerous requirement for the claimant to meet, *see Hudson v. Bowen,* 870 F.2d 1392, 1395 (8th Cir.1989), but it is also not a toothless standard." *Kirby v. Astrue,* 500 F.3d 705, 707–08 (8th Cir. 2007). A slight abnormality that would insignificantly limit the claimant's physical or mental ability to do basic work activities does not amount to a severe impairment. *Kirby v. Astrue*, 500 F.3d at 707–08 (citing *Bowen v. Yuckert,* 482 U.S. 137, 153 (1987)); *see also Page v. Astrue,* 484 F.3d 1040, 1043 (8th Cir. 2007). Kuhl did not list his cognitive problems in his disability application; he testified that he was of average intelligence [AR 54]; and that his memory was better [AR 73]. At the hearing, Kuhl's nonattorney representative added that "the neuro psych . . . really won't come into play" in the ALJ's disability determination [AR 75].

Furthermore, failure to identify a particular severe impairment at Step Two is harmless when the ALJ finds a severe impairment and proceeds to the next Steps, where the ALJ then considers the whole record, including the nonsevere impairments. *See Dewey v. Astrue*, 509 F.3d 447, 449–50 (8th Cir. 2007); *see also Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008); *see also Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005); *see also Hall v. Colvin*, No. C15-15-CJW, 2016 WL 1267759, at *5 (N.D. Iowa Mar. 30, 2016). Here, the ALJ found at least one severe impairment and moved on to the next Steps; the ALJ considered Kuhl's cognitive functioning when determining his RFC [AR 24].

### B. The ALJ's RFC Determination Accounted for All of Kuhl's Limitations

Kuhl argues that the ALJ was in error by failing to account for his cognitive impairments and the severity of his hypertension when determining his RFC. The ALJ must determine what a claimant is capable of doing, despite his limitations. 20 C.F.R. § 404.1545. An RFC determination is based on the totality of the evidence. *Page v. Astrue,* 484 F.3d at 1043. The ALJ determined that Kuhl could perform medium level work, but that Kuhl could not constantly handle, finger, or feel. The burden is on the claimant to prove that he lacks the RFC to perform his past relevant work. *Gonzalez v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006) (citing 20 C.F.R. §§ 404.1520, 416.920)); *see also Hines v. Astrue*, 317 F. App'x 576, 578 (8th Cir. 2009).

Substantial medical evidence supports the ALJ's determination that Kuhl's cognitive limitations would not deter him from performing his past relevant work. The ALJ found Kuhl to be credible. Examining-specialists Dr. Sundell and Dr. Sheese both opined that Kuhl's cognitive abilities were in the normal range, and did not diagnose him with a cognitive impairment. Kuhl's subjective complaints during his hearing, and in his medical records, support the ALJ's determination that Kuhl's cognitive limitations would not deter him from past relevant work.

Kuhl did not list a cognitive impairment on his original disability application, and the ALJ could rely on Kuhl's testimony that he was of average intelligence [AR 54], his memory was better [AR 73], and the claim by Kuhl's nonattorney representative that "the neuro psych . . . really won't come into play" [AR 75].

Substantial medical evidence supports the ALJ's determination that Kuhl's hypertension would not deter him from performing his past relevant work. Dr. Jarzobski conducted a stress test, determined the results were negative, and that Kuhl's hypertension was stable. The physician assistant observing the test noted that it was not optimal because Kuhl was uncooperative; she opined that the negative results underestimated his functioning level. Another examining physician, Dr. Teirney, opined in 2012, that Kuhl's CPK elevation was due to musculoskeletal breakdown, not cardiac disease [AR 410]. Treating physician Dr. Kent noted that Kuhl's hypertension was well-controlled with medication [AR 459]. Kuhl argues that the ALJ should have given weight to Table Four in the California Code for Cardiac Disabilities, which shows that a person with a 5-7 Peak METS performance should, at a minimum, be limited to light work. *See* Cal. Code Regs, Title 8, § 45. However, Kuhl has not shown that the California State Disability Code is a widely recognized standard or provided an argument for why the ALJ or this Court should rely on it. Even if the California Code was binding on the agency, it states that other objective and subjective factors should be considered by the ALJ when making a final disability finding. *See* Cal. Code Regs, Title 8, § 45. The ALJ's decision was based upon more evidence than a METS performance score alone; the ALJ viewed all of the objective and subjective factors in finding Kuhl was not disabled under the Social Security Act.

Kuhl's own testimony also supported the ALJ's determination that Kuhl's hypertension would not preclude him from past relevant work. The medical record shows Kuhl complained

about shortness of breath, and Kuhl testified that getting dressed could sometimes wear him out [AR 62]. However, Kuhl also testified that he mowed the lawn in fifteen minute increments, maintained his home, cooked simple meals, drove his car to the casino and to visit friends, and did his laundry [62]. *See Turpin v. Colvin*, 750 F.3d 989, 993 (8th Cir. 2014) ("An ALJ weighs the credibility of a claimant's subjective complaints [regarding the severity of an impairment] by considering multiple factors, including daily activities"); s*ee also Warnick v. Apfel*, 221 F.3d 1346 (8th Cir. 2000). Kuhl also testified that if he was not awarded Social Security Disability, he would have to start thinking about whether to go back to work [AR 64]. The Court finds that there was substantial evidence in the record as a whole to support the ALJ's determination that Kuhl's hypertension and cognitive functioning would not deter him from working in the "truck driver, heavy," classification.

Kuhl made a third argument that if the ALJ had used an appropriate RFC, Kuhl would be entitled to disability benefits. This argument fails because the ALJ did use an appropriate RFC when determining that Kuhl was not disabled under the Social Security Act.

## VII. CONCLUSION

The ALJ's decision that Kuhl did not have a severe cognitive impairment and the ALJ's RFC determination were supported by substantial evidence on the record, including the objective medical evidence, Kuhl's subjective complaints, and Kuhl's testimony during the hearing.

## VIII. REPORT AND RECOMMENDATION AND ORDER

IT IS RESPECTFULLY RECOMMENDED that the Commissioner's decision to deny Kuhl disability insurance benefits be affirmed.

IT IS ORDERED that the parties have until November 1, 2016, to file written objections to the Report and Recommendation, pursuant to 28 U.S.C 636(b)(1)(C). Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and must set forth the basis for such objections. *See* Fed. R. Civ. P. 72; *see also Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995). Failure to timely file objections may constitute a waiver of Plaintiff's right to appeal questions of fact. *United States v. Kelley*, 774 F.3d 434, 439 (8th Cir. 2014) (citing *Thomas v. Arn*, 474 U.S. 140, 155 (1985)).

IT IS SO ORDERED.

Dated this 17th day of October, 2016.

_____
Celeste F. Bremer
Chief United States Magistrate Judge